## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**BRANDON PELLEGRIN**                                  **CIVIL ACTION**

**VERSUS**                                             **NO:  14-2161**

**MONTCO OILFIELD**                                    **SECTION: "S" (1)**
**CONTRACTORS, LLC**

## OPINION AND ORDER

     **IT IS HEREBY ORDERED** that Montco Offshore, Inc. and Montco Oilfield Contractors, LLC's Motion for Partial Summary Judgment on Seaman's Status (Doc. #33) is **DENIED**.

     **IT IS FURTHER ORDERED** that Montco Oilfield Contractors, LLC's Motion for Partial Summary Judgment regarding plaintiff's claim for attorneys' fees and punitive damages associated with the alleged arbitrary and capricious failure to provide maintenance and cure (Doc. #45) is **DENIED**.

     **IT IS FURTHER ORDERED** that the United States Magistrate Judge's April 29, 2015, Order granting plaintiff's motion seeking the identities of the defendants' excess insurance carriers up to $50 million of coverage  (Doc. #48) is **AFFIRMED**.  Defendants must identify their excess insurers in accordance with that Order by June 22, 2015.

     **IT IS FURTHER ORDERED** that Plaintiff's Second Motion to Extend Deadline to Amend Pleadings and Third-Party Actions, Cross-Claims and Counterclaims (Doc. #37) is **GRANTED**, and such pleadings must be filed by June 29, 2015.

**BACKGROUND**

This matter is before the court on a motion for partial summary judgment regarding seaman status filed by defendants, Montco Oilfield Contractors, LLC ("MOC") and Montco Offshore, Inc ("Montco Offshore"). MOC filed a motion for partial summary judgment regarding plaintiff's claim for attorneys' fees and punitive damages related to his maintenance and cure claim. Also before the court is defendants' appeal of the United States Magistrate Judge's Order requiring them to identify their excess insurers up to the $50,000,000 level. Plaintiff, Brandon Pellegrin, filed a motion to extend the deadline to file amended complaints in order for him to add those insurers as defendants once they are identified.

In 2013, Pellegrin was employed by MOC as an offshore welder engaged in the deconstruction of decommissioned offshore platforms. While performing this work, Pellegrin and the other MOC employees were stationed aboard the L/B ROBERT, a lift vessel owned and operated by Montco Offshore that was jacked down beside the platform being decommissioned. The MOC employees rode on the L/B ROBERT from one job site to another, but once the vessel was stationed at a jobsite, the MOC employees went to and from the vessel via crewboat for their hitches. The MOC employees ate and slept aboard the L/B ROBERT. Daily production and safety meetings were held aboard the L/B ROBERT in the PAC-1 Level television room. Thereafter, the MOC welders would go to their field office, a shipping container on the L/B ROBERT's deck, to sign job safety analyses.

The welders worked on the platform being decommissioned, a materials barge and the L/B ROBERT. On the platform, the welders would cut material to be taken away and install lifting eyes on that material. Once the scrap metal was lifted to the material barge by the L/B ROBERT's cranes,

the MOC welders would weld it in place for transport.  On the L/B ROBERT the MOC welders did preprepartory work related to the work on the platform or material barge.

Pellegrin began a two-week hitch on October 14, 2013.  On October 16 and 17, 2013, he informed  his supervisor, Jonathan Granier, that he was feeling ill with nausea and a headache. Granier excused Pellegrin from work and sent him to a private bunk room.  Granier informed the L/B ROBERT's captain and medic, and defendants' headquarters about Pellegrin's condition.  On October 19, 2013, Pellegrin was sent ashore on a crewboat with another worker who was claiming to be ill.  Pellegrin's co-worker drove Pellegrin to defendants' headquarters, where Pellegrin's fiancée, picked him up and brought him home.  After Pellegrin was home for two days, his fiancée brought him to the emergency room at Terrebone General Hospital.  Pellegrin was diagnosed with pneumococcal meningitis and transported to Touro Infirmary in New Orleans, Louisiana, where he remained for two weeks.

On December 13, 2013, Pellegrin's physician released him to full duty and Pellegrin returned to work for MOC.  In September 2014, Pellegrin was fired for allegedly tampering with a computer Internet router located in the ceiling of one of the L/B ROBERT's television rooms.

On September 19, 2014, Pellegrin filed this action against Montco Offshore alleging that he was a seaman and crew member of the L/B ROBERT when he contracted pneumococcal meningitis. He alleged that he sustained brain damage and other injuries because Montco Offshore failed to provide immediate medical care, and that Montco Offshore is liable under the Jones Act and the general maritime law of unseaworthiness.  Pellegrin also alleged that he "may be entitled to maintenance and cure."

Pellegrin has filed several amended complaints. The first amended complaint added MOC as a defendant.  In the second amended complaint, Pellegrin alleged an alterative claim under the Longshore and Harbor Workers' Compensation Act against Montco Offshore, and a claim for punitive damages for MOC's "willful and wanton failure to pay maintenance and cure."  The third amended complaint added defendants' primary insurance carrier, Houston Casualty Company, as a defendant, and increased Pellegrin's damages demand from $2,000,000 to $5,000,000. The fourth amended complaint added defendants' excess insurance carrier, Certain Underwriters at Lloyds of London; the company that provided the emergency medical technician aboard the L/B ROBERT, Phoenix Offshore Solutions; and, Phoenix's insurance carrier, Atlantic Specialty Insurance Company, as defendants.  Also, in the fourth amended complaint, Pellegin alleged that Montco "willfully and wantonly failed to provide cure to [him] when he became seriously ill aboard the L/B ROBERT," and seeks punitive damages for Montco's "willful and wanton failure to provide cure."

## ANALYSIS

### A.    Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure provides that the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Granting a motion for summary judgment is proper if the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits filed in support of the motion demonstrate that there is no genuine issue as to any material fact that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 106 S.Ct. 2505, 2509-10 (1986).  The court must find "[a] factual dispute . . . [to be] 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party

. . . [and a] fact . . . [to be] 'material' if it might affect the outcome of the suit under the governing substantive law." Beck v. Somerset Techs., Inc., 882 F.2d 993, 996 (5th Cir. 1989) (citing Anderson, 106 S.Ct. at 2510).

If the moving party meets the initial burden of establishing that there is no genuine issue, the burden shifts to the non-moving party to produce evidence of the existence of a genuine issue for trial. Celeotex Corp. v. Catrett, 106 S.Ct. 2548, 2552 (1986). The non-movant cannot satisfy the summary judgment burden with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence. Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). If the opposing party bears the burden of proof at trial, the moving party does not have to submit evidentiary documents to properly support its motion, but need only point out the absence of evidence supporting the essential elements of the opposing party's case. Saunders v. Michelin Tire Corp., 942 F.2d 299, 301 (5th Cir. 1991).

### 1.   Montco's Motion for Summary Judgment Regarding Seaman Status (Doc. #33)

Montco argues that Pellegrin does not qualify as a seaman because less than 30% of his work was performed on the L/B ROBERT.

The Jones Act provides that a "seaman injured in the course of employment . . . may elect to bring a civil action at law, with the right of trial by jury, against the employer." 46 U.S.C. § 30104. The Jones Act does not define "seaman." See id. The plaintiff bears the burden of establishing seaman status. Becker v. Tidewater, Inc., 335 F.3d 376, 390 n. 8 (5th Cir.2003). Determining "whether an injured worker is a seaman under the Jones Act is a mixed question of law and fact and it is usually inappropriate to take the question from the jury." Id. at 386. However, the court may take the question from the jury by granting summary judgment or a directed verdict when

the undisputed facts demonstrate that the maritime worker clearly does not meet the criteria for seaman status. Alexander v. Express Energy Servs. Operating, L.P., 784 F.3d 1032, 1034 (5th Cir. 2015).

"Though the Jones Act does not define 'seaman,' Congress has elsewhere defined it as the 'master or member of any crew of any vessel." Naquin v. Elevating Boats, L.L.C., 744 F.3d 927, 932 (5th Cir. 2014) (quoting Chandris, Inc. v. Latsis, 115 S.Ct. 2172, 2183 (1995)). In Chandris, 115 S.Ct. at 2189-90, the Supreme Court of the United States test established a two-prong test for determining whether a maritime employee is a seaman under the Jones Act.

First, the employee's duties must "contribute to the function of the vessel or to the accomplishment of its mission." Id. Satisfying this prong of the seaman test is relatively easy because the individual "need only show that he does the ship's work." Naquin, 744 F.3d at 933 (quoting Becker, 335 F.3d at 387-88).

Second, the employee "must have a connection to a vessel in navigation (or to an identifiable group of such vessels) that is substantial in terms of both its duration and its nature." Chandris, 115 S.Ct. at 2189-90. The claimed connection to a vessel or fleet of vessels must be "temporally, more than fleeting, and, substantively, more than incidental[,]" because

> the fundamental purpose of the substantial connection requirement is "to separate the sea-based maritime employees who are entitled to Jones Act protection from those land-based workers who have only a transitory or sporadic connection to a vessel in navigation, and therefore whose employment does not regularly expose them to the perils of the sea."

Naquin, 744 F.3d at 933 (quoting and citing Chandris, 115 S.Ct. at 2190-91).

In determining whether an employee has a substantial connection to a vessel or an identifiable fleet of vessels under common ownership in navigation, the Supreme Court of the

6

United States has adopted the position taken by the United States Court of Appeals for the Fifth Circuit that "[a] worker who spends less then about 30 percent of his time in the service of a vessel in navigation should not qualify as a seaman under the Jones Act." Chandris, 115 S.Ct. at 2191. The Court explained that the 30% rule of thumb:

> serves as no more than a guideline established by years of experience, and departure from it will certainly be justified in appropriate cases. As we have said, "[t]he inquiry into seaman status is of necessity fact specific; it will depend on the nature of the vessel and the employee's precise relation to it."

Id. (quoting McDermott Int'l, Inc. v. Wilander, 111 S.Ct. 807, 818 (1991)).  The 30% benchmark refers to the time that the maritime worker actually spends working on the vessel or group of vessels. Alexander, 784 F.3d at 1037. "When a group of vessels is at issue, a worker who aspires to seaman status must show that at least 30 percent of his time was spent on vessels, every one of which was under his defendant-employer's common ownership or control." Roberts v. Cardinal Servs., Inc., 266 F.3d 368, 377 (5th Cir. 2001); see also Naquin, 744 F.3d at 933 (citing Harbor Tug & Barge Co. v. Papai, 117 S.Ct. 1535, 1542 (1997); Bertrand v. Int'l Mooring & Marine, Inc., 700 F.2d 240, 245-46 (5th Cir. 1983)).

Defendants argue that Pellegrin was not a member of the L/B ROBERT's crew.  They characterizes Pellegrin as a platform-based worker and a passenger aboard the L/B ROBERT.  They contend that the vessel's mission was to serve as a floating hotel for the MOC employees who were working on decommissioning the platform.  Defendants argue that the precedents set by the United States Court of Appeals for the Fifth Circuit in Hufnagel v. Omega Serv. Indus., Inc., 182 F.3d 340 (5th Cir. 1999) and Alexander v. Express Energy Servs. Operating, L.P., 784 F.3d 1032 (5th Cir. 2015), are directly on point and dictate that Pellegrin does not satisfy the test for seaman status.

7

In Hufnagel, 182 F.3d at 344, the plaintiff, Richard H. Hufnagel, was employed as a rigger by defendant, Omega Services Industries, Inc., which was an oilfield service company that contracted with offshore platform owners to construed and repair offshore oil and gas platforms. When Omega was hired, it would assign employees to the job based on the type of work requested. Id. The platform owner would arrange transportation for the Omega workers to the platform where they would remain until the work was complete. Id. Sometimes the Omega workers would sleep and eat on the platform, other times, the platform owner would supply a jack-up vessel to serve as a "hotel" for the Omega workers. Id. Omega did not own or hire any vessels, and its employees were not assigned as crew members to any vessels. Id.

Hufnagel was injured on a drilling platform and sued Omega; the platform owner, and the owner of the AMBERJACK, the adjacent jack-up boat that was being used on that job. Id. Hufnagel claimed that he spent most of his working hours aboard the AMBERJACK, but he did not have any duties specific to the maintenance, custody, or operation of the vessel. Id. at 345. The court found that Hufnagel did not satisfy the test for seaman status. Id. at 346-48. Omega, Hufnagel's employer, did not own or control the AMBERJACK, and he did not allege nor prove that he was a borrowed servant of the AMBERJACK or its owner. Id. at 346-47. The court found that Hufnagel's duties involved platform work. Id. at 347. Sleeping, eating and spending time on the AMBERJACK did not make him of the vessel's crew. Id. Hufnagel was not "doing the ship's work" because "his sole purpose for being present on . . . the AMBERJACK related to the repair of the platform[,]" and his duties "were not related to the navigation, maintenance, or voyage of the AMBERJACK." Id. The AMBERJACK's mission was "to support the repair crew by providing lodging quarters and a work area." Id. Further, Hufnagel did not have a substantial temporal connection to the AMBERJACK,

because he had never previously been aboard the vessel, and could not expect to be aboard it again during his employment with Omega. Id. Moreover, the court found that Hufnagel did not have a substantial connection to an identifiable group of vessels under common ownership or control because when he "and other Omega employees slept on vessels during some assignments, the vessels were always different, provided by different customers, and owned and operated by different companies." Id.

Similarly, in Alexander, 784 F.3d at 1035, the plaintiff, Michael Alexander, was employed by Express Energy Services Operating, L.P. as a lead hand/operator in the plug and abandonment ("P & A") department.  Express specialized in plugging decommissioned oil wells on various platfroms off the coast of Louisiana.  Id. At the time of his injury, Alexander was working on a P & A project on a platform owned by Apache Corporation. Id.  The L/B RAM X, a vessel owned by Aries Marine Corporation, was positioned next to the platform to aid in the operation.  Id.  The P & A operation utilized a crane attached to the L/B RAM X that was operated by an Aries employee. Id.  Alexander was working on the platform, and "injured when a wireline from the crane snapped, dropping a bridge plug/tool combination which had been suspended a foot above the deck, which then rolled onto his foot." Id. at 1036.

Alexander claimed to be a seaman under the Jones Act.  Id.  He argued that approximately 35% of the platform jobs he worked on while employed by Express involved the use of an adjacent liftboat.  Id. The court found that he did not meet the temporal requirement for seaman status because he never offered any evidence that 30% of more of his actual work time was spent on a vessel. Id.  Instead, the evidence showed that most of Alexander's work occurred on the platform,

and it was insufficient that he was near a vessel on more than 30% of his jobs or that he performed some incidental work on a vessel on those jobs. Id. at 1037.

This case is distinguishable from Hufnagel and Alexander.  In Hufnagel and Alexander, the vessels were owned and controlled by entities completely separate from plaintiffs' employers. Hufnagel had never before been on the AMBERJACK, and could not expect that he ever would be again.  Further, neither Hufnagel nor Alexander had any duties pertaining to the vessels at issue.

Here, there are genuine issues of material fact regarding Pellegrin's precise relationship to the L/B ROBERT.  Pellegrin was employed by MOC, and permanently assigned to the L/B ROBERT.  The L/B ROBERT was owned and operated by Montco Offshore, a related entity.  The record does not clearly establish the relationship between Montco Offshore and MOC.[1]  There is no information to evaluate whether MOC actually controlled the L/B ROBERT, or whether MOC's employees were Montco Offshore's borrowed servants.[2]  Similarly, the record is unclear as to

---

[1]  Corporations generally function as distinct legal entities that are separate from the individuals that own then, and shareholders are not liable for the corporation's debts. Hollowell v. Orleans Regional Hosp. LLC, 217 F.3d 379, 385 (5th Cir. 2000). However, when two or more corporations constitute a single business enterprise, the court can "disregard the concept of corporate separateness and extend liability to each of the affiliated corporations for the purpose of preventing fraud or achieving equity." In re Ark–La–Tex Timber Co., Inc., 482 F.3d 319, 335 (5th Cir. 2007) (quotation omitted). A single business enterprise among corporations "occurs when a corporation is found to be the 'alter ego, agent, tool or instrumentality of another corporation." Dishon v. Ponthie, 918 So.2d 1132, 1135 (La. Ct. App. 2005).

[2]  "An injured worker may show that he was a borrowed servant at the time of his injury by establishing that the employer against whom recovery is sought had the power to control and direct the (servant) in the performance of (his) work." Id. at 178 (quotations and citations omitted). The borrowed servant doctrine "places the risk of a worker's injury on his actual rather than his nominal employer" by permitting him to recover from the company that actually directed his work. Id. (citations omitted). In Ruiz v. Shell Oil Co., 413 F.2d 310, 312–13 (5th Cir.1969), the United States Court of Appeals for the Fifth Circuit outlined nine factors to be used to determine whether the borrowed employee doctrine applies. These factors include the following considerations:

(1) Who has control over the employee and the work he is performing, beyond mere suggestion of details of cooperation?

whether the materials barges used in the work were controlled by MOC.  Moreover, Pellegrin's and Granier's deposition testimony, along with Pellegrin's affidavit, create genuine issues of material fact regarding Pellegrin's temporal connection to the L/B ROBERT.

At his deposition, Pellegrin testified that 90% of his work was done on the platform, not the L/B ROBERT.  He testified that the vessel had a separate captain and crew from whom he did not take orders.  He reported to Granier and another MOC employee.

Similarly, Granier testified that 90% of Pellegrin's work was done on the L/B ROBERT. However, Granier admitted that Pellegrin worked for the vessel captain when the captain asked him to do maintenance work on the vessel, but this did not occur often.  Further, Granier testified that the MOC welders, including Pellegrin, did welding work on the L/B ROBERT in preparation for working on the platform, and that the MOC welders did a substantial amount of work outfitting the L/B ROBERT to perform the platform decommissioning work, such as installing Conexes, boom rests, and sling racks.

---

(2) Whose work is being performed?

(3) Was there an agreement, understanding, or meeting of the minds between the original and the borrowing employer?

(4) Did the employee acquiesce in the new work situation?

(5) Did the original employer terminate his relationship with the employee?

(6) Who furnished the tools and the place of performance?

(7) Was the new employment over a considerable length of time?

(8) Who had the right to discharge the employee?

(9) Who had the obligation to pay the employee?

See also Melancon v. Amoco Prod. Co., 834 F.2d 1238, 1244 (5th Cir.1988).

Pellegrin filed an affidavit with his opposition memorandum in which he claims that 60% of his work was done aboard the L/B ROBERT, not 90% as he testified in his deposition. He attributes this apparent change in his estimate to the inclusion in this affidavit of the work he did outfitting the L/B ROBERT to perform the decommissioning work when the vessel first went into service. He declares that, in addition to all of the work described by Granier, he built racks for holding scaffold boards, built a life jacket rack, relocated a water sonar from one side of the vessel to the other, built a welders' material rack, organized the path of equipment on the vessel deck, and helped riggers paint the vessel's deck. Pellegrin claims that he was not asked about the outfitting work during his deposition, and concludes that "[w]ith all of the above stated work, as well as the normal maintenance on the L/B ROBERT  including repairs to the crane, engine room and other maintenance, as well as daily meeting aboard the L/B ROBERT, I estimate that at least 60% of my total work time for [MOC] was aboard the L/B ROBERT."

Defendants argue that Pellegrin's affidavit is a self-serving "sham affidavit" that should not be considered. A "sham affidavit," is one that is introduced in bad faith because it is contradictory to prior deposition testimony. Turner v. Baylor Richardson Med. Ctr., 476 F.3d 337, 349 (5th Cir. 2007). It cannot be used to defeat summary judgment. See BLS Joint Venture v. Bank Home Sav. Assoc., 985 F.2d 556, 1993 WL 35859 (5th Cir. 1993).

Pellegrin's affidavit does not contradict his deposition testimony. Instead, it supplements it with information regarding the work Pellegrin did with respect to the original outfitting of the L/B ROBERT to perform the decommissioning work. Granier testified regarding this work. Pellegrin's affidavit is consistent with Granier's testimony. In Chandris, 115 S.Ct. at 2187, the Court stated that, "[i]n evaluating the employment-related connection of a maritime worker to a vessel in navigation,

courts should not employ a 'snapshot' test for seaman status, inspecting only the situation as it exists at the instant of injury; a more enduring relationship is contemplated in the jurisprudence." (quotations and citations omitted).  The affidavit raises a genuine issue of material fact regarding the amount of time Pellegrin spent working on the L/B ROBERT when all of the circumstances of his employment are considered.[3]  Thus, there are genuine issues of material fact that preclude summary judgment on seaman status, and defendants' motion is DENIED.

### 2.    MOC's Motion for Summary Judgment Regarding Attorneys' Fees and Punitive Damages Regarding Maintenance and Cure (Doc. #45)

MOC argues that Pellegrin's claim for attorneys' fees and punitive damages associated with its alleged failure to pay maintenance and cure must be dismissed because MOC has paid all maintenance and cure due.  Pellegrin agrees that all maintenance and cure has been paid, but argues that his claim for attorneys' fees and punitive damages is associated with MOC's willful and wanton failure to provide cure while he was aboard the L/B ROBERT, and then failing to send him ashore via helicopter and immediately take him to the hospital.  MOC, citing McBrice v. Estis Well Service, 768 F.3d 382 (5th Cir. 2014), *on rehearing en banc*, counters that, as a matter of law, Pellegrin cannot maintain a claim for attorneys' fees and punitive damages associated with its alleged failure to provide cure.

In Cortes v. Balt. Insular Line, Inc., 53 S.Ct. 173 (1932), *superseded on other grounds by statute as recognized in* Miles v. Apex Marine Corp., 111 S.Ct. 317 (1990), the Supreme Court of

---

[3] There is no evidence in the record regarding whether the L/B ROBERT was still under construction when the MOC welders performed the outfitting work referred to by Granier and Pellegrin.  A vessel that is under construction is not a "vessel in navigation" for the purposes of the Jones Act.  Cain v. Transocean Offshore USA, Inc., 518 F.3d 295, 296 (5th Cir. 2008).  Thus, there is a genuine issue of material fact regarding whether this work can be considered in determining whether Pellegrin meets the test for seaman status.

the United States held that a seaman has a claim under both the Jones Act and the general maritime law for breach of the maritime duty of maintenance and cure if the failure to provide maintenance and cure has aggravated his illness and caused him injury.  See also Atl. Sounding Co., Inc. v. Townsend, 129 S.Ct. 2561, 2574 (2009) ("the Cortes decision explicitly acknowledged a seaman's right to choose among overlapping statutory and common-law remedies for injuries sustained by the denial of maintenance and cure"). The court stated that the damages include the necessary expenses and compensation for the hurt. Cortes, 53 S.Ct. at 174 (citing The Iroquois, 24 S.Ct. 640 (1904)).

The Townsend decision affirmed a seaman's right to recover punitive damages for his employer's willful and wanton failure to provide maintenance and cure.  In Townsend, 129 S.Ct. at 2566-68, the Supreme Court of the United States explored the history of the availability of punitive damages under the general maritime law.  It recognized that "the legal duty to provide maintenance and cure dates back centuries as an aspect of general maritime law, and the failure of a seaman's employers to provide him with adequate medical care was the basis for awarding punitive damages in cases decided as early as the 1800's." Id. at 2568.  The Court concluded that "[b]ecause punitive damages have long been an accepted remedy under general maritime law, and because nothing in the Jones Act altered this understanding, such damages for the willful and wanton disregard of maintenance and cure obligation should remain available in the appropriate cases as a matter of general maritime law." Id. at 2575.

Townsend abrogated the United States Court of Appeals for the Fifth Circuit's en banc decision in Guevara v. Maritime Overseas Corp., 59 F.3d 1496, 1513 (5th Cir.1995), which held that punitive damages are not recoverable for an employer's willful failure to pay maintenance and cure. See Townsend, 129 S.Ct. at 2566. Thus, Townsend restores the previous Fifth Circuit precedent

14

under which both punitive damages and attorneys' fees are recoverable when an employer has willfully failed to honor its maintenance and cure obligation. See, e.g., Morales v.. Garijak, Inc., 829 F.2d 1355, 1358 (5th Cir. 1987).

MOC argues that McBrice v. Estis Well Service, 768 F.3d 382 (5th Cir. 2014), *on rehearing en banc*, precludes Pellegrin from recovering attorneys' fees and punitive damages for its alleged willful and wanton failure to provide cure. McBride presented an opportunity for the United States Court of Appeals for the Fifth Circuit to consider the effect of Townsend on continued viability of Miles v. Apex Marine Corp., 111 S.Ct. 317 (1990), as applicable precedent. The Miles Court held that "the Jones Act limits a seaman's recovery to pecuniary losses where liability is predicated on the Jones Act or unseaworthiness." McBride, 768 F.3d at 384. In McBride, the court found that Townsend did not overrule Miles, and a seaman or his representative cannot recover non-pecuniary losses for personal injury or wrongful death under the Jones Act or general maritime law. Id. Neither Miles nor McBride addressed maintenance and cure. Id. at 386. Townsend, 129 S.Ct. at 2575, on the other hand, was specifically about maintenance and cure. Therefore, McBride does not preclude a seaman from recovering attorneys' fees and punitive damages for his employer's alleged willful and wanton failure to fulfill its maintenance and cure obligation.

Pellegrin brought his claim for punitive damages for MOC's failure to provide cure under the general maritime law of maintenance and cure, which is permitted by Cortes. Punitive damages and attorneys' fees are available for failure to fulfill its maintenance and cure obligation under Townsend. McBride does not impact that principle. Therefore, MOC's motion for partial summary judgment regarding Pellegrin's claim for attorneys' fees and punitive damages associated with its alleged failure to provide cure is DENIED.

15

**D.      Montco's Appeal of the United States Magistrate Judge's Order Compelling the Production of Excess Insurance Information (Doc. #50)**

Judge Shushan ordered defendants to identify their its excess insurers that provide up to $50 million in coverage. She cited Rule 26(a)(1)(A)(iv) of the Federal Rules of Civil Procedure, which provides for the inspection and copying of any insurance agreement under which "an insurance business may be liable to satisfy all or part of a possible judgment in the action . . .," and reasoned that the information was discoverable because "[t]he complaint, as amended, asserts claims which may exceed $5 million."

Defendants argue that they should not be required to produce this information because: (1) Pellegrin intends to disclose the information to the jury, which is not permitted; (2) Pellegrin's complaint demands only $5 million dollars, thus this information is irrelevant; (3) Pellegrin's claim for punitive damages for the failure to pay maintenance and cure has no merit; and, (4) it is impossible for any judgment in Pellegrin's favor to exceed $5 million because he was able to return to work and does not have estimates for extensive future medical care.  Defendants also argue that it would be unduly burdensome to obtain the information for the insurers that subscribed to its coverage through Lloyd's of London because of there are many insurers that subscribe to the slip in varying amounts.

Pellegrin contends that he does not intend to disclose the insurance information to the jury because it is forbidden by the Federal Rules of Evidence, and that his claim could exceed $5 million. Thus, the information is discoverable.

"The Federal Magistrates Act grants district courts authority to assign magistrates certain described functions as well as such additional duties as are not inconsistent with the Constitution and laws of the United States." Peretz v. United States, 111 S.Ct. 2661, 2663 (1991) (internal

quotation and footnote citation omitted).  Pursuant to 28 U.S.C. § 636(b)(1)(A), a district judge may designate a magistrate judge to hear any pretrial matter pending before the court, with a few exceptions.  The district judge reviews the magistrate judge's orders on pretrial matters assigned under subparagraph (A) on a clearly erroneous or contrary to law standard. 28 U.S.C. § 636(b)(1)(A). This highly deferential standard requires the court to affirm the decision of the magistrate judge unless "on the entire evidence [the court] is left with a definite and firm conviction that a mistake has been committed." United States v. Unites States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948).

In this case, the United States Magistrate Judge's Order directing defendants to identify their excess insurers is not clearly erroneous.  Pellegrin has demanded $5,000,000 in damages, and has an additional claim for attorneys' fees and punitive damages related to his maintenance and cure claim.  Therefore, it is not unreasonable  to conclude that the amount of the judgment could exceed $5,000,000,  and the insurers' identities are discoverable under Rule 26(a)(1)(A)(iv).  The United States Magistrate Judge's Order is AFFIRMED.  Defendants must produce the information by June 22, 2015.

**E.     Pellegrin's Motion to Extend the Deadline to File Amended Pleadings and Third-Party Actions, Cross-Claims and Counterclaims (Doc. #37)**

Pellegrin argues that the deadline to filed amended pleadings and third-party actions, cross-claims and counterclaims should be extended to allow him to name defendants' excess insurers when defendants identify those insurers pursuant to the United States Magistrate Judge's Order.  Because this court has affirmed the United States Magistrate Judge's Order requiring defendants to identify their excess insurers, Pellegrin's motion to extend the deadline to file amended pleadings and third-

party actions, cross-claims and counterclaims is GRANTED, and the deadline is extended to June 29, 2015.

## CONCLUSION

**IT IS HEREBY ORDERED** that Montco Offshore, Inc. and Montco Oilfield Contractors, LLC's Motion for Partial Summary Judgment on Seaman's Status (Doc. #33) is **DENIED**.

**IT IS FURTHER ORDERED** that Montco Oilfield Contractors, LLC's Motion for Partial Summary Judgment regarding plaintiff's claim for attorneys' fees and punitive damages associated with the alleged arbitrary and capricious failure to provide maintenance and cure (Doc. #45) is **DENIED**.

**IT IS FURTHER ORDERED** that the United States Magistrate Judge's April 29, 2015, Order granting plaintiff's motion seeking the identities of the defendants' excess insurance carriers up to $50 million of coverage  (Doc. #48) is **AFFIRMED**.  Defendants must identify their excess insurers in accordance with that Order by June 22, 2015.

**IT IS FURTHER ORDERED** that Plaintiff's Second Motion to Extend Deadline to Amend Pleadings and Third-Party Actions, Cross-Claims and Counterclaims (Doc. #37) is **GRANTED**, and such pleadings must be filed by June 29, 2015.

New Orleans, Louisiana, this  <u>11th</u>  day of June, 2015.

**MARY ANN VIAL LEMMON**
**UNITED STATES DISTRICT JUDGE**